COURT OF APPEALS









COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS

 


 
 
  
 MARIA GURROLA,
  
                             Appellant,
  
 v.
  
 THE STATE OF TEXAS,
  
                             Appellee.
 
 
  
 '
    
 '
    
 '
    
 '
    
 '
    
  ' 
  
 
 
  
  
                 No. 08-01-00107-CR
  
 Appeal from the
  
 243rd District Court
  
 of El Paso County, Texas 
  
 (TC# 20000D02316) 
  
 
 


O P I N I O N

 

This appeal presents the question of
whether one of two signatories to a joint checking account commits theft by
depleting funds in that account without the knowledge of the other
signatory.  Finding that, as a matter of
law, signatories to a joint checking account are co-owners of the funds
therein, but further finding there is evidence the joint account was
established without the effective consent of both owners, we affirm.

Facts








Maria Gurrola,
appellant here and defendant below,  is the niece of complaining witness
Soledad Lozoya. 
Lozoya is in her nineties, unmarried, has no
children, and until March 1997 lived in Juarez, Chihuahua, Mexico.  At that time, a drunk driver crashed into Lozoya=s house, destroying it and sending her into shock.  Several days after the accident, Gurrola and her husband brought Lozoya
to a hospital in El Paso.  Lozoya paid her own hospital bills.  She also paid  $2,300 to a Juarez neighbor, Jose Gil,
to repair her home.  While the house was
being repaired she lived with Gurrola and her family
in El Paso for about five months.  She
then returned to Juarez.

In April 1997, Gurrola
took Lozoya to Norwest Bank in El Paso where Lozoya had her checking account.  Lozoya testified
that on that day she was sick, was using supplemental oxygen, and did not understand
what they had arranged there.  Gurrola and Lozoya met with Queta Zwittag, the banker who
handled Lozoya=s accounts.  Zwittag first
became acquainted with Lozoya in 1995 and for years
saw her every month when Lozoya would come into the
bank to have Zwittag help balance her account and
facilitate her monthly withdrawal of about $400.  In the years Zwittag
has known Lozoya, her customer always seemed quite
sharp and lucid.








Zwittag opened joint accounts for Lozoya and Gurrola.  Zwittig said Lozoya seemed a little weaker than usual, and she was Akind of shocked@ to see her like that.  Upon opening the joint accounts, Zwittag advised both Gurrola and Lozoya that the joint accounts had rights and liabilities,
including the fact that both parties can write checks, withdraw funds, and make
deposits.  Lozoya
and Gurrola opened two accounts that day--a joint
checking account and a joint money-market savings account.  Each required only one signature to withdraw
funds.  Zwittig
testified she would have refused to open the joint accounts if she thought Lozoya had not understood what their joint status meant.

Zwittag characterized Lozoya=s spending habits as Avery conservative@ and noted that prior to the creation
of the joint accounts, she made only a single monthly  withdrawal of money for Athe essentials.@ 
After the joint accounts were created, Zwittag
found the account activity incompatible with Lozoya=s established pattern.  Zwittag did not see
Lozoya for several months after she opened the joint
accounts, which was also unusual.  One
day Lozoya returned to the bank alone.  She told Zwittag
she had returned to Juarez because her house had been repaired, and asked about
the status of her accounts.  Lozoya was very upset when she learned that large
withdrawals had been made from the joint accounts.  Lozoya told Zwittag she had not been receiving her bank statements, nor
did Lozoya recognize any of the transactions when
they reviewed them together.

Lozoya testified that $27,220 was stolen by
Gurrola from the joint accounts.  She did not give Gurrola
permission to take this money.  Lozoya testified she had offered Gurrola
$2,000 to help with the purchase of a van, but Gurrola
took the money out of the joint account without her permission.  Lozoya also
testified she paid Gurrola=s husband for some repairs to the
house in Juarez.  She also agreed she
gave Gurrola=s daughter Maria $500 to help her
with expenses.








Lozoya filed a complaint with the El Paso
County Sheriff=s Department concerning the missing
money.  El Paso County Sheriff=s Department Detective Jaime Terrazas investigated the case.  On direct examination, Terrazas
was asked whether Gurrola ever provided receipts to
confirm her statement about how the money was spent.  He answered:

None whatsoever.  We rescheduled for Friday.  The interview was conducted, I believe, on a
Tuesday.  I asked her how much time she
needed to provide the documents.  She
asked me for a couple of days, so I set an appointment for Friday morning about
8:00 or 9:00 in the morning Friday, that same Friday that we--she failed to
show up in my office.

 

I
believe our appointment was about 9:00. 
And I called her at home wanting to know why she
hadn=t come to the office. 
I had a conversation with her over the phone advising me that she had
consulted a lawyer.  She was a little
rude with me and told me that she didn=t have to give me anything, that she=d been advised not to talk to me and that she wasn=t going to give me squat.

 

Hector Lozoya,
Gurrola=s brother, testified that Lozoya confided in him that she thought money was missing
when she came to visit him in California in July 1997.  He offered to help Lozoya
send a letter to the bank instructing them not to allow any more
withdrawals.  He also helped Gurrola move about $20,000 to a Mexican bank.

Jesus Gurrola,
defendant=s husband, testified they had plans
to build an extension to their house so Lozoya could
live with them permanently.  Although
they obtained a building permit, the extension was never built, in part because
the I.N.S. would not permit Lozoya to remain in the
United States.  Lozoya
ultimately expressed a desire to return to her home in Juarez.  Jesus Gurrola
produced no receipts for repairs made to the Juarez house.  He testified that he paid for materials
bought for the repairs with money received from Gurrola,
and he personally made a number of the repairs.








Hector Lozoya
testified that although he did go to Juarez with his brother-in-law to check on
repairs to the house, Jesus Gurrola never did any
work while Hector was there.  Jesus also
agreed that Lozoya=s neighbor, Gil, made repairs to the
Juarez house.  Jesus estimated that
$9,000 was spent for repairs.  A receipt
from Gil for repairs to the house was produced by the State; Jesus did not
recognize this receipt.

 Gurrola=s daughter, Maria, testified Lozoya (her godmother) gave Maria $670 to help with
expenses and another $170 so she could pay off a loan.  She conceded these checks were signed by Gurrola, however. 
Maria claimed Lozoya told them to take
whatever they wanted to purchase the van they needed to transport Gurrola because of her back surgery.  Lozoya was happy at
the Gurrola household and Maria was sorry she could
not stay.  Maria visited Lozoya after she moved back to Juarez and asked her to drop
the charges against Gurrola.  In July 2000, Lozoya=s Juarez neighbor heard Gurrola trying to convince Lozoya
to drop the charges by telling her the money would be returned.

Bank records indicate the joint
checking account was opened on April 8, 1997 with an initial deposit of
$33,982.94 representing $29,982.94 from Lozoya=s old accounts and a $4,000 deposit
from Gurrola.  By July 15, 1997, the checking account was
closed with a zero balance.  The balance
on the money-market account when the joint account was created was $13,739.97.  By June 30, 1997, the balance was $9,843.07.








Detective Terrazas
calculated that a total of $18,982.94 was taken from the checking account.
Another $8,548.82 was taken from the money market account with $7,341.50
withdrawn through ATM machines, and $1,207.32 taken from non-ATM sources. Terrazas testified he verified and correlated every check
and entry before including it in the summary tally.  Based on these figures, Terrazas
concluded that Gurrola took $27,531.76 from Lozoya=s accounts in five months. 
He also admitted that he did not know how much of the money was taken
without Lozoya=s consent.  Lozoya told him
that she believed that she had gone to the bank to arrange a one-time
withdrawal, not to allow Gurrola to continue taking
money from the account.

The case was submitted to a jury on
an uncontested charge.  The jury found Gurrola guilty and sentenced her to five years= imprisonment.

Theft
of funds from joint account by co-signatory








In her third, fourth, and fifth
points of error,[1]
Gurrola contends that the evidence was legally
insufficient to prove an element of the offense of theft, because as signatory
on joint accounts she was an owner with equal right to possession of the funds
deposited therein.  In determining
whether the evidence was legally sufficient to support the conviction, we
examine all the evidence in the light most favorable to the verdict in order to
determine whether any rational trier of fact could
find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443
U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560
(1979); Lane v. State, 933 S.W.2d 504, 507 (Tex. Crim.
App.1996).  We do not re-examine
the evidence and impose our own judgment as to whether the evidence establishes
guilt beyond a reasonable doubt, but only to determine if the findings of fact
are rational.  Lucero
v. State, 915 S.W.2d 612, 614 (Tex. App.--El Paso 1996, pet. ref=d).  Neither do we resolve conflicts of fact or
assign credibility to witnesses.  Id.
We resolve any inconsistencies in favor of the verdict.  Id.

Theft
under Texas Probate Code Section 438

First, Gurrola
contends that, as a matter of law, because the State indicted her under the
theft statute generally, and because she was a joint owner of the account, the
State=s proof failed in that the undisputed
evidence was that she was an owner with equal right to possession of the
accounts during the time specified in the indictment.  The indictment read:

[F]rom on or about 8th day of April, 1997 until on
or about the 16th day of July, 1997, [Maria Gurrola]
did then and there unlawfully appropriate, by acquiring and otherwise
exercising control over property other than real property, to wit:  United States Currency of the value of
$20,000 or more but less than $100,000 from Soledad Lozoya,
the owner thereof, with intent to deprive the said owner of said property[.]

 

The evidence is undisputed that Gurrola
and her aunt, Soledad Lozoya, were co-signers to
joint bank accounts created April 8, 1997. 
The funds which Gurrola withdrew from those
accounts are the source of the theft conviction here, and the State does not
contend otherwise.








Rather, the State=s response to Gurrola=s ownership claim is two-fold:  (1) the Texas Probate Code governs basic
ownership and withdrawal rights, and Gurrola was only
owner of account funds to the extent that she contributed funds on deposit in
the account; and (2) Gurrola=s withdrawal of the funds was without
Lozoya=s effective consent.  We will address the effective consent argument
hereafter, but first we consider the ownership status of a co-signatory to a
joint account as a matter of law.[2]

The State relies upon Tex. Prob. Code Ann. ' 438(a) (Vernon 2003) in contending
that it proved Gurrola was not entitled to withdraw
funds as she did.  That statute provides:

A
joint account belongs, during the lifetime of all parties, to the parties in
proportion to the net contributions by each to the sums on deposit, unless
there is clear and convincing evidence of a different intent. 

 

Based upon this authority, it contends that Gurrola committed theft insofar as her withdrawals, made
without her aunt=s specific consent, exceeded any amounts she deposited in the
joint accounts.  For the following
reasons, we disagree.

Most importantly, the State ignores
the limiting language that immediately precedes section 438.  Tex.
Prob. Code Ann. ' 437 (Vernon 2003) provides:








The
provisions of Sections 438 through 440 of this code that concern beneficial
ownership as between parties, or as between parties and P.O.D. payees or
beneficiaries of multiple-party accounts, are relevant only to controversies
between these persons and their creditors and other successors, and have no
bearing on the power of withdrawal of these persons as determined by the terms
of account contracts.

 

Thus, although Gurrola=s creditors would not be entitled to
proceeds of the joint accounts that were deposited by her aunt, the terms of
the joint account allowed her to withdraw whatever funds were on deposit (as
indeed she did) and the Probate Code does nothing to alter that contractual
right.

In a case factually identical to the
one here, the Montana Supreme Court came to the same conclusion.  State v. Kane, 297
Mont. 421, 992 P.2d 1283, 1285-86 (Mont. 1999).  There, Kane was a long-time friend of Hilger, who was in his mid-eighties and ill.  Hilger executed a
general power of attorney in Kane=s favor, and the two established a
joint checking account.  Kane wrote
numerous checks out of the account to herself, which the State alleged were for
her personal use.  The State urged that Kane=s use of Hilger=s funds, in violation of her position
of trust, was theft because even though she was a joint owner of the account,
she was authorized to use Hilger=s funds only for his benefit.  Id. at 1285.

The court disagreed.  It cited Montana probate statutes,
substantially identical to the Texas Probate Code provisions cited above, in
concluding that:

Although,
the wisdom of the arrangement between Kane and Hilger
was certainly questionable, and Kane=s
actions may have breached the duty of loyalty as an agent, because the State
does not allege that Kane deceived or threatened Hilger
into establishing the joint tenant arrangement her actions do not make out the
elements of the criminal theft statute. 
We hold that the District Court did not err in concluding that as a
matter of law, Kane could not be prosecuted for theft of funds from the joint
account with Hilger. 
Id. at 1286.

 








The same reasoning applies here.  Access to the funds in a joint bank account
is controlled by the contractual agreement between the signatories and the
bank, and the law governing such contracts. 
Joint accounts such as those established by Lozoya
and her niece Gurrola are generally fully accessible
by both parties.  For this reason, we
reject the first legal sufficiency theory propounded by the State. 

Sufficiency
of evidence to establish theft by deception

As an alternative theory, however,
the State contends that there is legally sufficient evidence to support the
conviction on the basis of deception.  In
measuring the sufficiency of evidence to sustain a conviction, we measure the
elements of the offense as defined by a hypothetically correct jury
charge.  Malik v. State, 953
S.W.2d 234, 239 (Tex. Crim. App. 1997).  Such a charge is one that accurately sets out
the law, is authorized by the indictment, does not unnecessarily restrict the
State=s theories of liability, and
adequately describes the particular offense for which the defendant was
tried.  Id. at
240.

The offense of theft is the unlawful
appropriation of property with the intent to deprive its owner of that property.  Tex. Pen. Code Ann. ' 31.03(a) (Vernon 2003).  Appropriation is unlawful if it is without
the owner=s effective consent.  Tex. Pen. Code Ann. ' 31.03(b) (Vernon 2003).  The jury in this case was charged, without
objection:

AEffective
consent@ includes consent by a person legally authorized to
act for the owner.  Consent is not
effective if induced by deception or coercion or given by a person the actor
knows is not legally authorized to act for the owner.

 








Conspicuously absent from the charge is that portion of the
definition of Aeffective consent@ which states consent is not
effective if Agiven by a person who by reason of
advanced age is known by the actor to have a diminished capacity to make
informed and rational decisions about the reasonable disposition of property.@ 
Tex. Pen.
Code Ann. ' 31.01(3)(E) (Vernon 2003).  Nevertheless, the State relies upon that
theory here, and following Malik, we
will consider that argument in determining the legal sufficiency of the
evidence on effective consent.

Viewing all the evidence in the light
most favorable to the verdict, we think there is legally sufficient evidence to
support a verdict based on theft by deception. 
Lozoya was in her nineties, she had recently
been through a traumatic experience which required her hospitalization, and she
was using supplemental oxygen when she and her niece went to open the joint
accounts.  During the months she lived
with Gurrola, Lozoya did
not receive her bank statements, nor was she familiar with Gurrola=s transactions when she reviewed her
account with her banker.  Lozoya testified she had not given Gurrola
permission to use her money, and told Detective Terrazas
that she believed the trip to the bank with Gurrola Awas a one-time deal to withdraw
money.@ 
Lozoya had no ATM card, and did not know what
an ATM machine was, but many withdrawals were made with an ATM card.  We think this is legally sufficient evidence
to support a conviction on the basis of lack of effective consent, despite Gurrola=s legal status as joint signatory on the accounts.  Appellant=s third, fourth and fifth points of
error are overruled.

Comments
on right to counsel and right to silence

In her first point of error, Gurrola claims the trial court erred in refusing a mistrial
when Detective Terrazas testified she had told him
she had consulted a lawyer and Awasn=t going to give [him] squat.@ 
Similarly, in her second point, she urges that the trial court=s denial of a mistrial was
fundamental error in that it constituted a denial of her rights under the Fifth
and Sixth Amendments to the U.S. Constitution.

A mistrial is a device used to halt
trial proceedings in extreme cases when error is so prejudicial as to appear
calculated to inflame the minds of the jury members.  Moore v. State, 882
S.W.2d 844, 847 (Tex. Crim. App. 1994).  A trial court=s denial of a motion for mistrial is
reviewed under an abuse of discretion standard.  State v. Gonzalez, 855 S.W.2d 692, 696 (Tex. Crim.
App. 1993).

When questioned as to whether Gurrola provided receipts to substantiate the monies used
from Lozoya=s account, Detective Terrazas testified as follows:

None whatsoever. We rescheduled for Friday. The interview was conducted, I believe, on
a Tuesday.  I asked her how much time she
needed to provide the documents.  She
asked me for a couple of days, so I set an appointment for Friday morning about
8:00 or 9:00 in the morning Friday, that same Friday that we--she failed to
show up in my office.

 

I
believe our appointment was about 9:00. And I called her at home wanting to
know why she hadn=t come to the office. I had a conversation with her
over the phone advising me that she had consulted a lawyer. She was a little
rude with me and told me that she didn=t have to give me anything, that she=d been advised not to talk to me and that she wasn=t going to give me squat. 

 








Gurrola=s counsel objected to this response,
requesting the jury be instructed to disregard Terrazas=s comments.  The trial court granted that request and
instructed the jury to ignore the Alast statement of the officer
regarding any conversations and her indication of what her attorney told her to
do.@ 
Defense counsel then moved for a mistrial, a request which the trial
court denied.  The witness was also
instructed not to talk about anything Gurrola might
have told him about counsel.

Commonly, harm can be cured by a jury
instruction to disregard improper evidence. 
Hernandez v. State, 805 S.W.2d 409, 413‑14
(Tex. Crim. App. 1990).   A mistrial is required only when the
improper evidence is clearly prejudicial to the defendant and is of such
character as to suggest the impossibility of withdrawing the impression
produced on the minds of the jurors.  Ladd
v. State, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999);  Mathews
v. State, 40 S.W.3d 179, 183 (Tex. App.--Texarkana 2001, pet. ref=d). 
The determination of whether a mistrial is required must be based on the
particular facts of each individual case. 
Vicioso v. State, 54 S.W.3d 104, 120 (Tex. App.‑-Waco 2001,
pet. ref=d).








Here, we cannot say the trial court
abused its discretion in denying Gurrola=s request for a mistrial.  The trial court gave a prompt and thorough
instruction that the jury was to disregard Terrazas=s testimony regarding Gurrola=s retention of counsel and not consider it for any
purpose.  The State did not pursue
further questions concerning any instructions given to Gurrola
by her attorney, nor did the State solicit the offending comments.  We therefore conclude that the instruction to
disregard was an adequate remedy for the comment.  We overrule Point of Error One.

Next, we turn to Gurrola=s second point, in which she contends
that Terrazas=s testimony was an impermissible
comment upon her right to remain silent and her right to counsel.  As such, she asserts that the trial court=s denial of her motion for mistrial
constitutes fundamental constitutional error because her rights under the Fifth
and Sixth Amendments to the U.S. Constitution were violated.

We first dispose of Gurrola=s claim that Terrazas=s testimony was a comment on her
right to counsel.  The Sixth Amendment
right to counsel does not attach until the Atime that adversary judicial
proceedings have been initiated, whether by way of formal charge, preliminary
hearing, indictment, information, or arraignment.@ Griffith v.
State, 55 S.W.3d 598, 603 (Tex. Crim. App. 2001).  In this case, Gurrola
voluntarily agreed to be interviewed by the sheriff at a point when  adversarial
proceedings had not yet been initiated against her.  She was therefore not an Aaccused@ within the meaning of the Sixth
Amendment and her right to counsel had not been violated.








Under certain circumstances, the
right to counsel also possesses a Fifth Amendment due process component.  Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240 (1976) (detainee=s silence or request for an attorney
cannot be used against him as substantive evidence).  However, it is the request for counsel that
is protected by the Fifth Amendment.  Gurrola=s statement that she was advised not to speak to Terrazas by her attorney is thus Amost accurately viewed as an attempt
. . . to convey [her] desire to remain silent.@ 
State v. Lee, 15 S.W.3d 921, 923-24 (Tex. Crim.
App. 2000) (emphasis in 
original).  We therefore
find there was no violation of Gurrola=s right to counsel in the context of
the Fifth Amendment.

The more troubling question is
whether Terrazas=s statement that Ashe=d been advised not to talk to me and
that she wasn=t going to give me squat@ constitutes a comment on Gurrola=s Fifth Amendment right to remain silent.  The State contends that because Gurrola was not in custodial interrogation, her Fifth
Amendment right to remain silent does not attach.  To support this contention they rely on two
Court of Criminal Appeals cases to stand for the
proposition that the defendant=s Fifth Amendment rights to counsel and to remain silent are
not violated when the defendant is not in custodial interrogation.  See Griffith, 55 S.W.3d at
602-03; State v. Lee, 15 S.W.3d 921, 925 (Tex. Crim.
App. 2000).  However, in both Griffith
and Lee the defendant had not yet been arrested and had not
yet received his Miranda rights.  Griffith,
55 S.W.3d at 605; Lee, 15 S.W.3d at 926.  In contrast, Gurrola
received her Miranda rights twice in the course of her interview with Terrazas.








 The Court of Criminal Appeals has consistently
held that AMiranda warnings inform a person of his
right to remain silent and assure him, at least implicitly, that his silence
will not be used against him.@ Griffith, 55 S.W.3d at 605.  Having been given Miranda warnings, Gurrola was thus entitled to the presumption that her
invocation of her right to silence would not be used against her when she spoke
with Terrazas. 
We find her Fifth Amendment right to remain silent was therefore
violated by the admission of Terrazas=s testimony.

The resolution of this issue, however,
does not end here.  Constitutional error
such as that presented by this case can be cured.  Laca v. State, 893 S.W.2d 171, 184
(Tex. App.‑-El Paso 1995, pet. ref=d) (prosecutor=s comment on defendant=s
failure to testify cured by instruction to disregard).  Again, the admission of improper evidence may
be corrected by an instruction to disregard except in extreme cases where it
appears that the evidence is clearly calculated to inflame the minds of the
jury and is of such character as to suggest the impossibility of withdrawing
the impression produced on their minds. Fletcher v. State,
852 S.W.2d 271, 275 (Tex. App.--Dallas 1993, pet. ref=d);
Waldo v. State, 746 S.W.2d 750, 752 (Tex. Crim.
App. 1988).








 If the instruction given can be said to have
removed the prejudicial effect of the improper comment, no error results from
the overruling of a motion for mistrial. 
Garza v. State, 878 S.W.2d 213 (Tex. App.--Corpus Christi 1994,
pet. ref=d) (prosecutor=s question in murder trial, which
elicited statement from officer that defendant did not give any statements when
arrested, not improper comment on defendant=s post-arrest silence and, even if it
were, trial court=s instruction to disregard was adequate to cure error);  Washington v. State, 822 S.W.2d 110,
118 (Tex. App.‑‑Waco 1991), rev=d on other grounds, 856 S.W.2d 184 (Tex. Crim. App. 1993).  In
this case, the trial court gave a prompt and thorough instruction to disregard
to the jury.  We find nothing in this
record that leads us to conclude that Terrazas=s comment was clearly calculated to
inflame the minds of the jury, or that the jury was fatally prejudiced by Terrazas=s testimony.  As
discussed above, we hold that the instruction to disregard cured any
prejudicial effect that may have resulted from the improper comment, and
overrule Point of Error Two.

Factually
sufficient evidence of theft over $20,000








Finally, in her sixth point of error,
Gurrola urges the evidence was factually insufficient
to support a conviction for theft over $20,000. 
In reviewing factual sufficiency points, we consider all of the
evidence, but do not view it in the light most favorable to the verdict.  Dominguez v. State, 62 S.W.3d 203, 205
(Tex. App.--El Paso 2000, pet. ref=d); see Clewis
v. State, 922 S.W.2d 126, 129 (Tex. Crim. App.
1996); Levario v. State, 964 S.W.2d
290, 295 (Tex. App.--El Paso 1997, no pet.). 
We will set aside the verdict only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.  See Levario,
964 S.W.2d at 295. 
As with legal sufficiency standards, we cannot substitute our factual
conclusions for those of the jury, nor is it within our province to interfere
with the jury=s resolution of conflicts in the
evidence or to pass on the weight or credibility of the witness=s testimony.  Dominguez, 62 S.W.3d
at 205.  Therefore, the jury=s verdict on such matters is
generally regarded as conclusive where the evidence conflicts.  Id. Terrazas testified that $27,531.76 was taken from the joint
accounts in five months.  The State
argued that $27,220 was stolen from the joint accounts.  In her written statement, Gurrola
said:  AI was told [by Detective Terrazas] that I was suspected of having taken
approximately $27,200.00 which sounds about correct. I explained to Detective Terrazas that I had approximately that much expenses.@

On appeal, Gurrola
now claims the overwhelming weight of the evidence reveals that Gurrola withdrew $15,370 from the joint accounts for Lozoya=s use and benefit, and thus her conviction for theft for more
than $20,000 and less than $100,000 cannot be sustained.[3]  Gurrola contends
she was authorized by Lozoya to remove the following
amounts of money from the joint accounts:

$9,000            Rebuilding Lozoya=s house in Juarez

$670               For Lozoya=s goddaughter Maria for living expenses

$2,000            Purchase of van
for the Gurrola family

$2,500            Room and board for
Lozoya while staying with Gurrola
family 

$1,200            Money withdrawn
from account before joint accounts created

We address this evidence in that order.








First, although Jesus Gurrola testified that $8,000 to $9,000 was spent on
repairing Lozoya=s house, he was unable to produce any
receipts for those expenses.  He also
admitted he received the money for the repairs from Gurrola
and that he had no idea what Gurrola was doing with
the account.  On the other hand, Lozoya testified she paid $2,300 for the repairs, including
some money she gave to Jesus.

It was the function of the jury to
resolve the factual conflicts in this evidence. 
Levario, 964 S.W.2d
at 295.  We find that the jury
could have reasonably rejected Gurrola=s contention that $9,000 was spent
from the account on repairs to Lozoya=s house in Juarez.

With regard to the money given to Lozoya=s niece, Maria, we assume for purposes of this discussion
that Lozoya did authorize the expenditure of $670 for
her living expenses.  We will also assume
that she authorized the withdrawal of $2,000 for the purchase of a van by the Gurrolas.

We next note that the only Aevidence@ supporting Gurrola=s contention that $2,500 was spent on
Lozoya=s room and board came from her
counsel in closing argument.  At that
time he argued that $9,000, or $1,500 a month, was spent on Lozoya=s care while she lived with the Gurrolas.  The jury
apparently rejected that argument and we have no authority to alter that
finding of fact.








Lastly, we find no evidence to
support Gurrola=s contention that $1,200 she
apparently took before the joint accounts were created cannot be included in
the aggregate theft amount.  Even if she
were correct in that assertion, Gurrola still only
accounts for $6,370 of the money taken from the accounts.  The joint checking account  was begun with $29,982.94 of Lozoya=s money. The joint savings account was begun with
$13,739.97.  A total of $43,722.91 of Lozoya=s funds thus went into the joint accounts.  On July 15, a total of $22,982.94 had been
withdrawn from the checking account.  A
total of $7,341.50 was withdrawn from ATMs and Gurrola
does not challenge those withdrawals on appeal. 
A total of $30,324.44 was therefore taken from the joint accounts.  That amount, minus the $6,370 which Gurrola accounts for, still accounts for more than $20,000
taken from the accounts by Gurrola.  The same conclusion results even if we use
the State=s allegation that $27,220 was taken
from the accounts.  We therefore hold
that the evidence cited by Gurrola does not
constitute an overwhelming weight of the evidence such that her conviction
should be reversed.  Her sixth point of
error is overruled.

Conclusion

Gurrola=s conviction for third-degree felony
theft is therefore affirmed.

 

SUSAN
LARSEN, Justice

October 16, 2003

 

Before Panel No. 5

Larsen, Chew, JJ., and Preslar, C.J. (Ret.)

Preslar, C.J., (Ret.) sitting by assignment

 

(Do Not Publish)











[1]Whether
Gurrola actually intends to bring a factual
sufficiency point on her argument concerning joint ownership is unclear.  Her fourth point of error states, AThe trial
court erred in failing to grant a directed verdict because the evidence was
factually insufficient.@  In the body of her brief, however, she
addresses factual sufficiency only in terms of the amounts proven to have been
taken from the accounts.  Failure to
adequately brief a ground of error or to cite authority in support presents
nothing for review.  Todd
v. State, 911 S.W.2d 807, 819 (Tex. App.--El Paso 1995, no pet.).  Accordingly, we overrule Point of Error Four.





[2]The
State actually abandoned this theory during oral argument, conceding that the
provision it relies upon is not intended to control disputes between
co-signatories.  Nevertheless, we think
it important to address the issue, as we perceive consequences to banking
practices inherent in the State=s
initial theory.





[3]A lesser-included charge for theft of more than $1,500
but less than $20,000 was contained in the jury charge.